*Thomasina Coates v. Charles County Board of Commissioners, et al.*, No. 1623, September Term, 2023.  Opinion by Nazarian, J.

**PERMANENT INJUNCTIONS – STANDING – MARYLAND UNIFORM DECLARATORY JUDGMENT ACT**

The Maryland Uniform Declaratory Judgment Act confers standing if a plaintiff meets one of the three statutory standing requirements set forth in Md. Code (1974, 2020 Repl. Vol.), §§ 3-401, 3-406 of the Courts & Judicial Proceedings Article and if declaratory relief will serve to terminate the controversy between the parties.

**PERMANENT INJUNCTIONS – STANDING – MARYLAND UNIFORM DECLARATORY JUDGMENT ACT**

Declaratory relief under the Maryland Uniform Declaratory Judgment Act is an appropriate vehicle for resolving disputes among and between government bodies, especially where the conflict stands to impair the government's ability to function or perform its essential duties.

**PERMANENT INJUNCTIONS – COMMON LAW STANDING – ELECTED OFFICIALS**

Individual commissioners of code county board of commissioners had common law standing to seek declaratory and injunctive relief against board and its members based on plaintiff commissioners' direct interest in protecting the integrity of the board, preserving public and employee confidence in their ability to govern effectively, and upholding their oath to execute federal, state, and county laws faithfully and to govern in the interests of their constituents.

**PERMANENT INJUNCTIONS – POLITICAL QUESTION – LOCAL GOVERNMENT**

Code county board of commissioners' duty to govern in compliance with its prior administrative decisions, rules of procedure, and state and federal law, board's impending breach of that duty, and circuit court's ability to grant declaratory and injunctive relief rendered controversy between individual board members capable of judicial resolution.

**PERMANENT INJUNCTIONS – POLITICAL QUESTION – EXPRESS POWERS ACT**

The Express Powers Act's commitment of the power to appoint, remove, and discipline county officers extends to the local legislative body, not individual commissioners. Accordingly, the circuit court could decide whether defendant commissioner had the authority to remove board's county administrator without offending the political question doctrine. Md. Code (2013, 2013 Repl. Vol.), §§ 10-303(b)–(c), 12-107(b) of the Local Government Article.

**PERMANENT INJUNCTION – POLITICAL QUESTION – LOCAL GOVERNMENT**

Indicia of political question not present where code county board of commissioners authorized plaintiff commissioners to seek declaratory relief from circuit court, plaintiffs sued to enforce board's administrative decision, and court kept issue of injunctive relief focused on defendant commissioner's authority to vote, rather than that of the board.

**PERMANENT INJUNCTION – PROMPT AND REMEDIAL ACTION – LOCAL GOVERNMENT**

Code county board of commissioners had administrative authority to take prompt and remedial action on matters affecting county administrator's employment, making board's personnel decision enforceable via injunction.

**PERMANENT INJUNCTION – PROMPT AND REMEDIAL ACTION – EMPLOYMENT DISCRIMINATION**

The question of whether a plaintiff is an "employee" entitled to protection under Title VII of the Civil Rights Act of 1964 rather than an "appointee on the policy making level" depends on the extent to which plaintiff's position is entrusted with extensive decision making authority and discretionary power. *See* 42 U.S.C. § 2000e(f).

**PERMANENT INJUNCTION – PROMPT AND REMEDIAL ACTION – EMPLOYMENT DISCRIMINATION**

County administrator for code county board of commissioners is an "employee" under Title VII of the Civil Rights Act of 1964 where administrator's powers are mostly executive,

county administrator position does not play a role in formulating public policy for the county, and board has not entrusted administrator with decision making authority or discretionary power on high-impact issues of public interest and importance. *See* 42 U.S.C. § 2000e-2(a).


**EVIDENCE – RELEVANCE – ABUSE OF DISCRETION**

When adjudicating a preliminary injunction, a circuit court does not abuse its discretion by focusing the scope of evidentiary proceedings on future, rather than past, acts, and rendering evidentiary rulings to that effect.


**ATTORNEY CLIENT PRIVILEGE – WAIVER – LOCAL GOVERNMENT**

Plaintiff commissioners could not waive attorney-client privilege on behalf of code county board of commissioners by attaching privileged, investigative report to their civil complaint where board received legal advice from outside attorney-investigator it retained and would have had to waive the privileged confidential communications it received.

Circuit Court for Charles County
Case No. C-08-CV-23-000002

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1623

September Term, 2023

_____

THOMASINA COATES

v.

CHARLES COUNTY BOARD OF
COMMISSIONERS, ET AL.

_____

Nazarian,
Friedman,
Zic,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: June 30, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

At its core, this is a story about governance. In a closed session, the Board of County Commissioners for Charles County (the "Board") voted to take Prompt and Remedial Action ("PRA") restricting the conduct of Commissioner Thomasina O. Coates based on the findings of an independent investigation into County Administrator Mark Belton's personnel complaint against her. After resuming its meeting in open session, the Board amended its Rules of Procedure (the "Rules") to include a policy statement prohibiting commissioners from engaging in "intimidating and disruptive workplace behaviors" against each other or county employees, including discrimination, harassment, defamation, or bullying. The amendment established a human resources process for any county employee alleging workplace mistreatment by a commissioner.

Two-and-a-half years later, Commissioner Coates tried to cast the deciding Board vote to fire Mr. Belton. Commissioners Gilbert O. Bowling, III, and Amanda M. Stewart objected to the validity of any Board action that included her vote. The Board authorized Commissioners Stewart and Bowling (the "Commissioners") to bring a civil action seeking a declaratory judgment on Commissioner Coates's authority to vote on Mr. Belton's employment in light of the PRA. The Commissioners did so, and after nine months of litigation, the Circuit Court for Charles County issued a permanent injunction in their favor. The order prohibited the Board from taking any action to rescind, amend, or modify the PRA or to rescind the amendment to the Rules with a vote that included Commissioner Coates. She appeals that judgment, and we affirm the circuit court's decisions and analysis in all respects. As a procedural matter, we vacate the dismissal of Commissioner Coates's counterclaim for declaratory judgment and remand for entry of a declaratory judgment

consistent with the circuit court's findings and conclusions as affirmed by this opinion.

## I.     BACKGROUND

Charles County operates under code home rule and is governed by a board of five county commissioners—a president, a vice president, and three district commissioners—elected at large to four-year terms. The Board conducts business during regular and special meetings where it votes in open (public) or closed (non-public) session on matters raised by motion. The Board passes local laws on "legislative days" after first holding a public hearing or information session, and it has adopted Rules for conducting its internal affairs. The Board president functions as the lead executive officer and works closely with the county administrator, who functions as the chief administrative officer of the county and manages the day-to-day operations of county government and all county staff. The Board can appoint and terminate the county administrator by majority vote, but it cannot hire or fire any other county employee.

### A.     Personnel Complaints and Investigation

On January 8, 2019, the Board—then made up of President Reuben B. Collins, II, Vice President Bobby Rucci, Commissioners Stewart and Bowling, and Commissioner Coates—entered into an agreement to employ Mr. Belton as county administrator. About five months later, Mr. Belton complained to the county human resources director that Commissioner Coates had sent him hostile and abusive emails and had made disparaging remarks about him to county employees, county residents, and state officials. After Mr. Belton's complaint against Commissioner Coates, she filed a human resources complaint against him alleging racial discrimination.

2

The Board had retained an outside investigator, Bernadette Sargeant, to investigate a separate discrimination complaint filed by a county employee against the Board, Mr. Belton, and his staff.[1] Ms. Sargeant had served previously as counsel to the Ethics Committee of the United States House of Representatives, and the Board and Mr. Belton's staff held her in high regard. The scope of her services expanded to include investigating the personnel complaints between Mr. Belton and Commissioner Coates.

After interviewing seven people and reviewing at least 137 documents, Ms. Sargeant produced an investigative report detailing her factual findings and conclusions (the "Report"). Based on "overwhelming" support, the Report concluded that Commissioner Coates had subjected Mr. Belton to an abusive hostile work environment and that Mr. Belton had suffered from Commissioner Coates's disparaging comments about him to county employees, county residents, and state officials. The Report referenced "strong direct evidence" of her racial biases and flagged failures by the Board which, together, increased potential liability exposure for the county:

> [Commissioner Coates's] infractions were so open and flagrant and recognized by the Board. Both Human Resources and the Board President tried to address [Commissioner Coates's] abusive tone and approach regarding [Mr. Belton] but their efforts failed and the conduct escalated and continued. It also appears likely that it was known to other commissioners that [Commissioner Coates] was making defamatory statements about [Mr. Belton] publicly in the community. Finally, and perhaps most troubling in terms of liability exposure, is the fact that when efforts to get [Commissioner Coates] to improve her behavior failed, [Mr. Belton] was approached about resigning.

---

[1] Ms. Sargeant's investigation found that the employee's claims weren't substantiated.

Further, the investigation concluded that Commissioner Coates's discrimination allegations against Mr. Belton were unsubstantiated. President Collins read a copy of the Report and arranged to have Ms. Sargeant present her findings to the Board on June 9, 2020.

### B. June 9, 2020 Board Meeting

At its regular meeting on June 9, 2020, the Board voted to enter closed session "to seek legal advice pertaining to personnel matters and investigations." The meeting included all commissioners, Ms. Sargeant, County Attorney Wesley Adams, and the Board's outside labor counsel, Eric Paltell. The commissioners received an executive summary of the Report, and Ms. Sargeant presented her investigative findings to the Board. After she received and answered the Board's questions, the county attorney and outside counsel advised the Board.

President Collins, an attorney experienced in employment law, stated that he felt the Board had "no other choice . . . but to adopt prompt and remedial measures necessary to protect" the county and individual commissioners. By a 4-1 vote, the Board passed a motion to take the prompt and remedial action by restricting Commissioner Coates's conduct and authority relative to Mr. Belton:

> that [Commissioner Coates] be excluded from having any input in any decision making, performance evaluation, contract negotiation or any other employment decision regarding Mark Belton, additionally, that [Commissioner Coates] will only communicate policy initiatives and staff requests through the Commissioner President or Vice-President and that she will refrain from directing, contacting, emailing, or calling the County Administrator directly.

Commissioner Coates voted against the Board's PRA.

The Board returned to open session to consider an amendment of its Rules which, until then, had not included a policy protecting county employees from discrimination, harassment, or bullying by commissioners. The proposed amendment to the Rules established a complaint process for county employees claiming to be aggrieved by a commissioner and an internal protocol for managing complaints and investigations. Under the amendment, related investigative findings would be presented to the Board in closed session, and any Board action would require the unanimous support of all commissioners not subject to the complaint. The amendment set forth available remedial actions including, for example, "public censure and/or suspension of the Commissioner's pay for one or more 30-day periods." And the amendment further proscribed retaliatory action by a commissioner against someone who complained in good faith against them. By a 4-1 vote, the Board amended its Rules; Commissioner Coates voted against the amendment.

The PRA did not include an expiration date and would remain shielded from the public for two-and-a-half years. During that time, the Board didn't take further action relative to the PRA or the amended Rules and Commissioner Coates didn't attempt to invalidate, rescind, or modify the PRA.

### C. December 13, 2022 Board Meeting

In November 2022, the voters of Charles County re-elected Commissioners Collins, Stewart, Bowling, and Coates, and elected a new member, Commissioner Ralph E. Patterson to the Board. The Board's first public meeting after the election took place on December 13, 2022. The evening before the meeting, President Collins added the topic of

5

Mr. Belton's employment to the agenda for a closed meeting discussion.

In the closed meeting, Commissioners Stewart and Bowling objected to Commissioner Coates's participation in any discussion or vote on Mr. Belton's employment in light of the PRA. President Collins questioned the ongoing effect of the PRA under a newly composed Board. Then Commissioners Collins, Patterson, and Coates attempted to pass a motion firing Mr. Belton. Commissioners Stewart and Bowling voted against the motion and contested the legality of the Board's vote due to the PRA. Both the county attorney and outside counsel participated and advised the Board. The county attorney cautioned that the body had acted against his legal advice and the advice of outside counsel and that he considered the vote invalid and illegal. He advised the Board to place Mr. Belton on administrative leave until January 10, 2023, which it did by unanimous vote. With that vote, the Board also authorized Commissioners Stewart and Bowling to bring a declaratory judgment action against Commissioners Coates, Collins, and Patterson to determine Commissioner Coates's authority to vote on Mr. Belton's employment.

D.     Litigation

On December 30, 2022, the Commissioners brought a Verified Complaint for Temporary Restraining Order ("TRO"), Permanent Injunction, and Declaratory Judgment[2] in the Circuit Court for Charles County against Commissioners Coates, Collins, and

---

[2] Counts I and II of the complaint asked for declaratory judgment and injunctive relief, respectively. Count III petitioned for a writ of mandamus and/or prohibition as an alternative to injunctive relief. Count IV asked the court to declare that the defendants aided, abetted, or attempted to commit a discriminatory act.

Patterson and the Board. Commissioner Coates filed a counterclaim seeking a declaratory judgment that Mr. Belton had been removed by the Board on December 13, 2022. Mr. Belton intervened as a party plaintiff, without objection.

On January 24, 2023, the circuit court dismissed the case against Commissioners Patterson and Collins and kept the Board in the case as a party. The court issued a TRO enforcing the PRA on February 15. From there, the parties proceeded to discovery. On August 14, 2023, the Board moved the circuit court to quash foreign subpoenas Commissioner Coates had obtained from the D.C. Superior Court and issued to Ms. Sargeant and her law firm, Stinson, LLC. The court granted the Board's motion and quashed both subpoenas on September 7. On September 13, 2023, the court denied Commissioner Coates's motion to compel the deposition testimony of County Attorney Adams.

After several motion hearings and rulings, a full-day evidentiary hearing on the plaintiffs' preliminary injunction, and closing arguments, the circuit court entered its final judgment on October 17, 2023. The court terminated the TRO and granted a permanent injunction enforcing the PRA. The court enjoined Commissioner Coates and the Board from taking any action to rescind, amend, or otherwise modify the PRA or to rescind the June 9, 2020 amendment to the Board's Rules with a vote that includes Commissioner Coates. And it dismissed Counts III and IV of the Commissioners' complaint and Commissioner Coates's counterclaim. Commissioner Coates noted her appeal of the order that day.

7

## II. DISCUSSION

Commissioner Coates raises six issues on appeal,[3] which we consolidate and recast:

---

[3] Commissioner Coates listed her Questions Presented as:

1. Did the trial court err, as a matter of law, in entering an injunction (the "Injunction") that, among other things, permanently bars a commissioner on the Charles County Board of County Commissioners from participating in a vote to terminate the employment of the County Administrator?

2. Was the evidence sufficient to support the entry of the Injunction?

3. Did the trial court abuse its discretion in denying Coates' Motion to Compel?

4. Did the trial court abuse its discretion in granting the Motion to Quash?

5. Did the trial court abuse its discretion in precluding the admission of exhibits and sustaining objections to testimony relevant to her defenses?

6. Did the trial court err in dismissing Coates' counterclaim?

The Commissioners listed the following Questions Presented:

1. Did the circuit court err in concluding that injunctive relief enforcing the PRA was appropriate and necessary to prevent irreparable injury to Appellee Commissioners, the Board, County Administrator Belton, and Charles County after "overwhelming" evidence established that Appellant had racially discriminated against Belton and that Appellant intended to do so in the future by voting to terminate his employment?

2. Did the circuit court abuse its discretion when it denied Appellant's requests for expansive and irrelevant discovery to collaterally attack the PRA and the underlying investigation that revealed "overwhelming" evidence of Appellant's discrimination, where Appellant admittedly

Continued . . .

(1) whether the circuit court erred or abused its discretion when it entered the permanent injunction and dismissed Commissioner Coates's counterclaim; and (2) whether the court abused its discretion when it granted the Board's motion to quash her foreign subpoenas, ruled as it did on the admission of exhibits and objections during the parties' preliminary injunction hearing, and denied her motion to compel the county attorney's deposition testimony.

"An injunction is 'a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience.'" *El Bey v. Moorish Sci. Temple of Am., Inc.*, 362 Md. 339, 353 (2001) (*quoting Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 394 (2000)). Ordinarily, the decision to grant an injunction falls within the sound judgment of the circuit court, which we review for abuse of discretion. *County Comm'rs for Carroll Cnty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 397 (2008) (*citing*

---

"took no action to" challenge the PRA for more than two years?

3.  Did the circuit court abuse its discretion when it dismissed Appellant's counterclaim alleging that Belton had been terminated by a vote of the Board on December 13, 2022, when the uncontroverted evidence established that no official vote occurred?

The Board stated the Questions Presented as:

1.  Did the trial court abuse its discretion in denying Appellant's Motion to Compel?

2.  Did the trial court abuse its discretion in granting the Board's Motion to Quash?

Mr. Belton adopted the Commissioners' Questions Presented.

*Maryland Comm'n on Hum. Rels. v. Downey Commc'ns, Inc.*, 110 Md. App. 493, 521 (1996)); *see also Tyler v. Sec'y of State*, 230 Md. 18, 20 (1962). A permanent injunction, however, is a final adjudication on the legal merits of the movant's claims, *see State Comm'n on Hum. Rels. v. Talbot Cnty. Det. Ctr.*, 370 Md. 115, 135–36 (2002) (*citing El Bey*, 362 Md. at 354), and we determine first whether the court's conclusions were "'legally correct under a de novo standard of review.'" *Floyd v. Balt. City Council*, 241 Md. App. 199, 208 (2019) (*quoting Johnson v. Francis*, 239 Md. App. 530, 542 (2018)).

We also consider the legal correctness of a decision to dismiss a party's claim. *Higginbotham v. Pub. Serv. Comm'n of Md.*, 171 Md. App. 254, 264 (2006). And we review rulings on motions to compel discovery, motions to quash subpoenas, and the admission of evidence for abuse of discretion. *See Maryland Bd. of Physicians v. Geier*, 225 Md. App. 114, 143 n.19 (2015) (discovery motions), *reconsideration denied in part and granted in part*, 451 Md. 526 (2017); *Floyd*, 241 Md. App. at 207 (motions to quash subpoenas); *Sail Zambezi, Ltd. v. Md. State Highway Admin.*, 217 Md. App. 138, 155 (2014) (admission of evidence).

### A.     The Circuit Court Permanently Enjoined Commissioner Coates Appropriately Because She Did Not Have The Authority To Vote On Mr. Belton's Employment After June 9, 2020.

Commissioner Coates raises eight arguments to challenge the circuit court's permanent injunction in favor of the Commissioners and Mr. Belton. *First*, she claims that the appellees lacked standing to bring suit against her and the Board. *Second*, she asserts that the court's dismissal of Count IV of the Commissioners' complaint undermined the purpose of the injunction. *Third*, she argues that the political question doctrine barred the

court from adjudicating their claims. *Fourth*, she maintains that the Board enacted the PRA invalidly or *ultra vires*. *Fifth*, she claims that the PRA and the injunction violated the First Amendment to the Constitution of the United States. *Sixth*, she asserts that Mr. Belton's claims under state and federal discrimination laws weren't actionable because he is a "high-level political appointee" rather than an "employee" of the Board. *Seventh*, she argues that the PRA was an unlawful bill of attainder. And *eighth*, she maintains that there wasn't enough evidence to warrant an injunction. We hold that the circuit court did not err legally or abuse its discretion when it entered a permanent injunction against Commissioner Coates and the Board.

> 1. *The Commissioners had statutory and common law standing based on their direct interests in enforcing the PRA and the Rules and in preserving public confidence in the integrity of their office.*

*First*, Commissioner Coates asserts that the Commissioners lacked standing to bring this lawsuit because they didn't suffer an injury from her actions. She argues further that because the complaint alleged that her conduct gave rise to an actionable discrimination claim against the county, Mr. Belton and the Commissioners should have exhausted administrative remedies under employment discrimination laws before seeking judicial relief.

The appellees counter that their complaint is grounded in the Declaratory Judgment Act, which confers standing independently. As sources of standing, the Commissioners point as well to their obligations to implement the county code, specifically its anti-discrimination employment policy, and to ensure the administration of county affairs in

compliance with the PRA and anti-discrimination laws. They claim a legitimate interest in supervising Mr. Belton without interference from Commissioner Coates's discriminatory animus. And Mr. Belton asserts that he's not required to exhaust administrative remedies here because the Commissioners didn't bring an employment discrimination claim against Commissioner Coates or the Board.

The circuit court found that the Commissioners' right and duty to protect themselves, their colleagues, and the county from violating the law conferred standing to sue Commissioner Coates and the Board. As support for its conclusion, the court pointed to the Board's vote authorizing the Commissioners to bring a private cause of action and decided that Mr. Belton had standing because his job was at risk. Because standing is a legal conclusion, we assess the circuit court's decision *de novo*, without deference, to determine whether it was correct. *Green v. Comm'n on Jud. Disabilities*, 247 Md. App. 591, 601 (2020).

Declaratory relief can issue only for justiciable disputes. *See Harford Cnty. v. Schultz*, 280 Md. 77, 85–86 (1977) (holding no justiciable controversy where county asked for declaration that its own acts were unconstitutional). A dispute is justiciable "'when there are interested parties asserting adverse claims'" based on a slate of facts that have transpired and from which "'a legal decision is sought or demanded.'" *Reyes v. Prince George's Cnty.*, 281 Md. 279, 288 (1977) (*quoting* 1 W. Anderson, *Actions for Declaratory Judgments* 67 (2d ed. 1951)). Within the "'umbrella of justiciability'" is the requirement that plaintiffs have standing to bring a lawsuit. *Pizza di Joey, LLC v. Mayor of Balt.*, 470 Md. 308, 343 (2020) (*quoting State v. G & C Gulf, Inc.*, 442 Md. 716, 720 n.2 (2015)). In

12

Maryland, "'cause-of-action'" standing is sufficient for justiciability, *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 502 (2014) (*quoting Kendall v. Howard Cnty.*, 431 Md. 590, 593 (2013)), and we look at whether a plaintiff is "'entitled to invoke the judicial process in a particular instance.'" *See id.* at 502 (*quoting Kendall*, 431 Md. at 593).

Standing can be grounded in different injuries, interests, or authorities. *See, e.g.*, *Reed v. McKeldin*, 207 Md. 553, 558 (1955) ("a taxpayer may invoke the aid of a court of equity to restrain the action of a public official or administrative agency when such an action is illegal or *ultra vires* and may injuriously affect the taxpayer's rights and property"); *State Ctr.*, 438 Md. at 519–20 (property owners have standing to challenge certain agency decisions if they have been "specially harmed" in a way different from the general public); *Greater Towson Council of Cmty. Ass'ns v. DMS Dev., LLC*, 234 Md. App. 388, 409 (2017) (a party to an administrative proceeding who is aggrieved by an agency decision has standing to seek judicial review of decision). One basis for standing is a private right of action. *See State Ctr.*, 438 Md. at 517.

Under the Maryland Uniform Declaratory Judgments Act (the "Act"), a county, any of its units, or an individual can pursue resolution of "any question of . . . validity arising under . . . [an] administrative rule or regulation . . . and obtain a declaration of rights, status, or other legal relations under it." Md. Code (1974, 2020 Repl. Vol.), §§ 3-401, 3-406 of the Courts & Judicial Proceedings Article ("CJP"). The Act is "remedial," aims "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations," and must be "liberally construed and administered." CJP § 3-402. A circuit

13

court may grant a declaratory judgment "if it will serve to terminate the uncertainty or controversy giving rise to the proceeding," CJP § 3-409(a), and if one of the following circumstances also applies:

> (1) An actual controversy exists between contending parties;
>
> (2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or
>
> (3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

CJP § 3-409(a)(1)–(3).

Unlike citizen lawsuits challenging government conduct or decisions, in this case the Board authorized its members to sue each other to resolve an internal governance dispute. From that vote, the Commissioners brought a claim for declaratory relief under the Act and were entitled to do so. They alleged sufficiently the existence of an actual controversy among them, the Board, and Commissioner Coates on the question of whether the latter could vote on Mr. Belton's employment. Their complaint described the Board's attempt to fire Mr. Belton in a vote that included Commissioner Coates and the Commissioners' objections to her authority, which illustrated the antagonistic claims among the parties. By describing the background of the investigation and the terms of the PRA, the complaint demonstrated the imminent risk of litigation against the county if Commissioner Coates were permitted to cast the deciding Board vote to fire Mr. Belton.

Citing *Provident Bank of Maryland v. DeChiaro Ltd. P'ship*, 98 Md. App. 596 (1993), Commissioner Coates claims that the Act does not confer standing generally. *Id.* at

14

612. In that case, a bank sued a limited partnership over an unpaid million-dollar loan it had made to the partnership. *Id.* at 598–99. The legal controversy over the note was between the bank and the limited partnership. *Id.* A trustee, acting on behalf of a trust that held a 99% ownership interest in the limited partnership as a limited partner, brought a separate legal action against the bank under the Act. *Id.* at 600, 602. The trustee asked the court for a declaratory judgment that the bank's claim against the limited partnership was unenforceable. *Id.* The trustee also asked for injunctive relief stopping the bank from pursuing its claim against the limited partnership and seeking damages against the bank for alleged conspiracy to divert trust assets. *Id.*

On appeal, this Court held that the Act didn't confer standing on the trustee or the trust because the trust had no direct interest in the underlying note, and thus no direct interest in the core dispute between the bank and the limited partnership. *Id.* at 612. Our holding aligned squarely with the text of the Act, which requires an actual controversy between parties, antagonistic claims between parties, or an assertion of a legal right, status, or privilege by a party that is challenged by another who has a concrete interest. *See* CJP § 3-409(a)(1)–(3); *Reyes*, 281 Md. at 289 (holding that taxpayers challenging a bond issue in a collusive lawsuit had concrete interest, conferring standing under CJP § 3-409).

This case differs substantially from *Provident Bank*. Here, the Commissioners brought an action for equitable relief against Commissioner Coates and the Board because they all were participants in this internal governance dispute. They aren't bringing an independent action from the outside or looking to tack claims onto a controversy between two other parties. All the commissioners had a direct interest in enforcing the Board's

15

decisions and rules and in protecting the integrity of the offices they hold. *Provident Bank* might apply if a constituent had sued the Board under the Act seeking a declaration on Commissioner Coates's authority. In that situation, however, the Act would not empower the constituent to bring that claim unless they met one of the three statutory standing requirements. *See* CJP § 3-409(a)(1)–(3).

Our Supreme Court has held that declaratory relief is an appropriate vehicle for resolving intra- and inter-governmental disputes. In *Liss v. Goodman*, 224 Md. 173 (1960), members of the Baltimore City Council sued members of the Baltimore City Board of Estimates seeking a declaratory judgment to define their respective powers relative to budgetary matters. *Id.* at 175. The city charter mandated that the board prepare lists of budget item appropriations each year, combine them into a proposed ordinance, and certify and publish the ordinance before transmitting it to the council, convening in a special session. *Id.* at 176. The council had the power to reduce the amounts of certain appropriations but couldn't increase the amounts or insert new appropriation items. *Id.* This structure led to friction between the two bodies. *Id.*

The city solicitor ruled that the council could not reject the board's ordinance or return it once the ordinance had been transmitted. *Id.* at 176–77. The city solicitor also ruled that the board could not recall its own ordinance to supplement or amend it. *Id.* The council asserted a right to reject or return the board's ordinance and voted unanimously to seek declaratory judgment from the circuit court on this question. *Id.* at 177–78. On appeal, the board asserted that there was no actual controversy between the parties, and no antagonistic claims indicating imminent litigation, and that the council had no concrete

16

interest. *Id.* at 175–76. Our Supreme Court disagreed, recognizing that each governmental body had "a legitimate interest in determining the extent of their respective powers," and concluding that their interests were sufficiently concrete under the Act. *Id.* at 177. The Court decided that the controversy was live and that relief under the Act was necessary to resolve an internal dispute of public magnitude:

> The Council has asserted a right to reject or return the ordinance when submitted. To do so in the closing days of the [fiscal] year without a prior adjudication might well cause an impasse and seriously affect the City's financial needs and obligations. It would seem to be peculiarly appropriate to have the issue resolved in advance. Other courts have indicated that declaratory relief is appropriate where public agencies are at loggerheads.

*Id.* at 177–78; *see also Anne Arundel Cnty. v. Ebersberger*, 62 Md. App. 360, 362, 371–72 (1985) (distinguishing *Liss* from homeowners' suit against county ordinance that would have required all community residents to pay for rebuilding and maintaining community pool, where issue did not present "the prospect of annual confrontations between public bodies in which the very operation of government or the security of public obligations may be placed in jeopardy"); *Prince George's Cnty. v. Md.-Nat'l Park & Plan. Comm'n*, 269 Md. 202, 208–09 (1973) (relying on *Liss* to recognize standing and conclude that declaratory relief was proper because the controversy between Commission and County went to the heart of the Commission's ability to carry out its legislative mandate). These cases teach us that the circuit court is an appropriate venue for disputes among and between government bodies, especially where the conflict stands to impair the government's ability to function or perform its essential duties. We reject Commissioner Coates's suggestion

17

that the Act doesn't confer standing ever, let alone in this case.

The Commissioners also had common law standing to seek declaratory and injunctive relief. Under Maryland common law, standing to bring a judicial action generally depends on whether one is "aggrieved," whether a plaintiff has "an interest such that he or she is personally and specifically affected in a way different from the public generally." *Jones v. Prince George's Cnty.*, 378 Md. 98, 118 (2003) (cleaned up); *see also Kendall*, 431 Md. at 609 (a general citizen claim to the right to have government run lawfully is insufficient to confer standing).

The Commissioners' direct interest in protecting the integrity of their office sets them apart from the general public. As elected officials, they have taken an oath to uphold federal, state, and county laws faithfully and have sworn to govern in the interests of the taxpayers of Charles County. They hold positions of community leadership. Commissioner-led counties like Charles County do challenge some of our base civics class understandings about the role of elected officials—commissioners in these counties fulfill both legislative and executive branch duties in their elected roles, and these overlapping functions can create tensions that they may need outside assistance in resolving. Allowing Commissioner Coates to cast the deciding vote to fire Mr. Belton would have placed the Board in dereliction of its own rules and decisions, actions it took ostensibly to protect county employees from workplace abuse. That situation likely would have damaged public confidence in the integrity of the Board. But it also could have come at a cost to the Commissioners and the citizens' faith in their ability to govern effectively. Like the Board, the Commissioners themselves were at risk of confronting this same crisis of confidence

18

from county employees. The circuit court recognized correctly that the Commissioners' duties conferred standing to seek equitable relief.

*Next*, Commissioner Coates argues that the appellees were not properly before the circuit court because they failed to exhaust all administrative remedies available under employment discrimination laws. We agree with her, but only as to Count IV of the Commissioners' complaint for declaratory relief under the Maryland Fair Employment Practices Act ("FEPA"). *See* Md. Code (1984, 2021 Repl. Vol.), §§ 20-606, 20-801 of the State Government Article ("SG").

When a state legislature creates a statutory administrative scheme as the primary redress for challenging a government action, the doctrine of administrative exhaustion requires the aggrieved person to complete that process before turning to the court for relief. *Priester v. Balt. Cnty.*, 232 Md. App. 178, 193 (2017) (citation omitted). The Maryland Commission on Civil Rights (the "Commission") is charged by statute with administering FEPA. *Downey*, 110 Md. App. at 529.[4] If a claim is "grounded entirely" on a FEPA provision, the Commission has primary jurisdiction, and plaintiffs must invoke and exhaust its administrative process before bringing an action in court. *Maryland-Nat'l Cap. Park & Plan. Comm'n v. Crawford*, 307 Md. 1, 25 n.10 (1986).

In Count IV of their complaint, the Commissioners alleged that Commissioner Coates attempted to incite the Board to discriminate against Mr. Belton. They asked the

---

[4] Before 2011, the Commission was called the Commission on Human Relations. *See* SG § 20-201, Editor's note.

circuit court to declare that her conduct violated SG § 20-801, which states that a person "may not: (1) aid, abet, incite, compel, or coerce any person to commit a discriminatory act; (2) attempt, directly or indirectly, alone or in concert with others, to commit a discriminatory act; or (3) obstruct or prevent any person from complying with [FEPA] or an order issued under [FEPA]." To adjudicate whether Commissioner Coates violated this statutory provision, the court would have had to interpret and apply FEPA, an action that falls within the subject matter expertise of the Commission. *See Downey*, 110 Md. App. at 529 (""[W]here the claim is initially cognizable in the courts but raises issues or relates to subject matter falling within the special expertise of an administrative agency," courts should defer to the expertise of the agency.'" (*quoting Consumer Prot. Div. v. Luskin's, Inc.*, 100 Md. App. 104, 113 (1994), *aff'd*, 338 Md. 188 (1995))).

In an ideal world, the circuit court would have dismissed Count IV before deciding the Commissioners' other equitable claims. *See Crawford*, 307 Md. at 18 (when a case involves both an administrative and judicial remedy, and the plaintiff pursues the judicial remedy after starting but not finishing the agency process, trial courts can retain and resume jurisdiction after administrative exhaustion); *see also id.* at 30–31 (holding that when an employee has a specific contractual or statutory cause of action for employment discrimination independent of FEPA, they don't have to invoke the agency process to maintain the independent judicial action). We conclude, however, that this error wasn't fatal to the Commissioners' standing on their other claims because the court never

exercised jurisdiction over Count IV and ultimately dismissed it.[5]

The administrative exhaustion requirement didn't apply to the Commissioners' claims under Counts I, II, and III. Primary agency jurisdiction doesn't apply if the legal issue requiring adjudication does not involve an "'interpretation of a law administered by the agency.'" *Downey*, 110 Md. App. at 529 (*quoting Board of Ed. for Dorchester Cnty. v. Hubbard*, 305 Md. 774, 791 (1986)). In this instance, a "'concurrent judicial remedy may be pursued without . . . invoking and exhausting a statutorily prescribed administrative remedy . . . .'" *Crawford*, 307 Md. at 25 (*quoting Hubbard*, 305 Md. at 791); *see also United Ins. Co. of Am. v. Md. Ins. Admin.*, 450 Md. 1, 35 (2016) (administrative exhaustion not required when "the issues presented by[] a judicial proceeding only tangentially or incidentally concern matters which the administrative agency was legislatively created to

---

[5] For these reasons we are unpersuaded by Commissioner Coates's argument that dismissal of Count IV negated the purpose of the injunction. Her brief cites *Bodnar v. Brinsfield*, 60 Md. App. 524 (1984), for the proposition that the court dismissed the claim with prejudice and, thus, "effectively found" that Commissioner Coates hadn't attempted to commit a discriminatory act under SG § 20-801. Not so. We read *Bodnar* to hold that when a claim has been heard on the merits and is dismissed, but without clarity on whether the dismissal is with or without prejudice, we presume the dismissal was with prejudice. 60 Md. App. at 538. Conversely, when a claim hasn't been heard on the merits, we presume the dismissal was without prejudice. *Id.* The circuit court didn't adjudicate Count IV on the merits at all. It dismissed the aiding and abetting claim after denying Commissioner Coates's motion for reconsideration and upholding the permanent injunction. Because dismissal of Count IV did not serve to exonerate Commissioner Coates, it had no effect on the injunction's purpose. We also reject the position that Mr. Belton is precluded from ever bringing an employment discrimination claim as a matter that "could have been adjudicated" in this lawsuit. The Commissioners sought declaratory and injunctive relief to enforce the PRA and to prevent Commissioner Coates from retaliating against Mr. Belton (and the Board from letting her). His retaliation claim against her and the county would not have ripened until the court reached its decision.

21

solve, and do not . . . call for or involve applications of its expertise").

The Commissioners' complaint raised claims for declaratory action under the Act (Count I), for injunctive relief (Count II), and for a writ of mandamus and/or prohibition under CJP § 3-8B-01 (Count III). These claims sought, in various ways, to have the court enforce the PRA, non-FEPA claims that would not come before the Commission. The Commissioners didn't ask the court to review the merits of the Sargeant investigation or otherwise to make any findings of discrimination. Nor did adjudicating their claims require expertise from the Commission in deciding whether a discriminatory act had occurred. The Rules also didn't establish an administrative remedy for addressing internal governance disputes among Board members, nor does the county code. As a result, the Board established an ad-hoc process on December 13, 2022 to address a specific conflict—by a unanimous vote, they authorized the Commissioners to bring an action for declaratory relief. The court found rightly that the doctrine of administrative exhaustion did not preclude it from adjudicating their claims.

Having determined that the Commissioners had standing to bring this lawsuit against the Board and Commissioner Coates, we don't need to consider the standing of other plaintiffs. *See State Ctr.*, 438 Md. at 527 (after concluding that a party has standing to bring an action, we don't usually inquire into "'whether another party on the same side [of the litigation] also has standing'" (*quoting Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md. App. 636, 652 (2012), *aff'd*, 432 Md. 292 (2013))). Once a party initiates an action for declaratory relief, "a person who has or claims any interest which would be affected by the declaration, shall be made a party," and thus has standing. CJP § 3-405(a).

22

The declaratory relief at issue in this case would determine whether Commissioner Coates could be the deciding Board vote to fire Mr. Belton, an outcome that would affect his livelihood directly. He moved to intervene as a plaintiff, without objection, and the court granted his motion. We need not discuss his standing any further.

2. *The court didn't decide a political question when it adjudicated Commissioner Coates's authority to vote on Mr. Belton's employment after June 9, 2020.*

*Second*, Commissioner Coates argues that enjoining her from voting to remove Mr. Belton was improper under the political question doctrine. The Commissioners counter that the circumstances did not present a political question because the PRA was an administrative act rather than a legislative one. We hold that the court's exercise of jurisdiction did not offend the principle of separation of powers because this case does not involve a political question.

Under the political question doctrine, courts should abstain from deciding matters that fall within the exclusive purview of the elected branches of government. *See Jones v. Anne Arundel Cnty.*, 432 Md. 386, 397 (2013) (*citing Nixon v. United States*, 506 U.S. 224, 252–53 (1993) (Souter, J., concurring)). Maryland courts have embraced a two-part framework for deciding whether an issue presents a nonjusticiable political question. *Smigiel v. Franchot*, 410 Md. 302, 324 (2009) (*citing Lamb v. Hammond*, 308 Md. 286, 293 (1987)). *First*, courts ask "'whether the claim presented and the relief sought are of the type which admit of judicial resolution.'" *Id.* (*quoting Lamb*, 308 Md. at 293). To satisfy this element, courts must decide whether "'the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be

judicially molded.'" *Lamb*, 308 Md. at 293 (*quoting Powell v. McCormack*, 395 U.S. 486, 517 (1969)). *Second*, courts decide whether the government structure renders the issue nonjusticiable due to constitutional separation of powers concerns. *Smigiel*, 410 Md. at 325 (*citing Lamb*, 308 Md. at 293); *see also Nixon*, 506 U.S. at 252–53 (Souter, J., concurring). To answer that question, our courts look for six potential indicators of a political question:

> "[A] textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving [the issue]; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Smigiel*, 410 Md. at 325 (*quoting Lamb*, 308 Md. at 293); *see also Jones*, 432 Md. at 397–98 (*quoting Baker v. Carr*, 369 U.S. 186, 217 (1962)).

We conclude *first* that the claims and equitable relief sought in this case were appropriate for judicial resolution. In the first instance, it was the Board, not the court, who determined on June 9, 2020 that Commissioner Coates couldn't vote on any personnel matters involving Mr. Belton or communicate with him directly. The Board retained Ms. Sargeant to conduct an independent investigation into the personnel complaints between them. Ms. Sargeant prepared a report of her investigative findings, which the Board president reviewed, and she presented her findings to the full body in a closed session with Commissioner Coates present. Afterwards, the Board adopted Ms. Sargeant's factual findings that Commissioner Coates had discriminated unlawfully against Mr. Belton and

24

resolved the matter by amending the Rules and imposing the PRA as a protective measure.

When they filed suit, the Commissioners asked the court to declare in essence that the Board was bound by its own PRA. The Board's duty to govern in compliance with the PRA, its Rules, and state and federal law, its impending breach of that duty on December 13, 2022, and the court's ability to grant declaratory and injunctive relief were all discernible. *See Marbury v. Madison*, 5 U.S. 137, 167 (1803) (where the heads of political departments are assigned a duty by law, and one feels injured by their failure to perform that duty, the person injured may seek legal recourse); *see also Hecht v. Crook*, 184 Md. 271, 280 (1945) ("Courts have the inherent power, through the writ of mandamus [or] by injunction . . . to correct abuses of discretion and . . . illegal . . . or unreasonable acts . . . ."). The role the Board asked the court to play was fully judicial and consistent with other cases where our courts have intervened. *Compare Maryland-Nat'l Cap. Park & Plan. Comm'n v. Crawford*, 59 Md. App. 276, 296–300 (1984) (affirming court's injunction against state agency for failing to follow its own internal rules), *aff'd*, 307 Md. 1 (1986), *with Beasly v. Ridout*, 94 Md. 641, 658–59 (1902) (statute directing judges to appoint members of the board of visitors for county jail was unconstitutional because it made judges an "appointing agency" responsible for nonjudicial functions).

*Next*, we look for potential indicators of a political question. Our courts apply the doctrine narrowly to the first indicator, a "textually demonstrable constitutional commitment," and will not abstain from reviewing actions that aren't prescribed expressly by the constitutional source of authority. *Jones*, 432 Md. at 400–01; *see also Lamb*, 308 Md. at 291, 303–04 (no political question where state law limited legislative power to judge

member elections and qualifications expressly by granting appeal rights in circuit court).

Commissioner Coates emphasizes that the Express Powers Act, Md. Code (2013, 2013 Repl. Vol.), § 10-303(b)–(c)[6] of the Local Government Article ("LG"), and LG § 12-107(b)[7] commit the power to appoint, remove, and discipline county officers like Mr. Belton to the Board alone. But our Supreme Court rejected this very argument twelve years ago in *Jones v. Anne Arundel County*, 432 Md. 386 (2013). The Court held in that case that an internal dispute about a county council's authority to remove one of its members was not a political question. *Id.* at 389–90, 401. There, a city council member facing a

---

[6] The relevant provisions of LG § 10-303 state:

> (b) A county may provide for the appointment and removal of all county officers except those whose appointment or election is provided for by the Maryland Constitution or public general law.
>
> (c) A county legislative body may enact local laws to:
>
> > (1) prevent conflicts between the private interests and public duties of county officers and members of the county legislative body;
> >
> > (2) govern the conduct and actions of all county officers and members of the county legislative body in the performance of their public duties; and
> >
> > (3) provide for penalties, including removal from office, for a violation of the local laws or any regulations adopted under the local laws.

[7] Section 12-107 of the Local Government Article employs very similar language to § 10-303 of the Express Powers Act. The main difference between them is that § 10-303 permits a county legislative body to enact local laws to prevent conflicts of interest among "county officers and members of the legislative body," LG § 10-303(c)(1), whereas § 12-107 allows the body to enact local laws or regulations to prevent conflicts of interest among "county officers or employees . . . ." LG § 12-107(c)(1).

five-month incarceration period in South Carolina sued the county and its council after the council introduced a bill and resolution to declare his seat vacant due to lack of county residency. *Id.* at 389–90, 392. The council member asked the court to declare that his temporary absence would not be a change in "residence" under the county charter and, thus, would not render his seat vacant. *Id.* at 393–94. The member also brought an action for injunctive and mandamus relief, asking the circuit court to stop the council from declaring his seat vacant and removing him from office. *Id.* at 394. The county and county council argued that removal of a councilmember was a political question that fell within their exclusive purview under the Express Powers Act, which provided that a county could:

> "enact local laws designed to prevent conflicts between the private interests and public duties of any county officers, including members of the county council, and to govern the conduct and actions of all such county officers in the performance of their public duties, and to provide for penalties, including removal from office, for violation of any such laws or the regulations adopted thereunder."

*Id.* at 395–97 (*quoting* Md. Code (1957, 2011 Repl. Vol.), § 5(Q)(1) of Article 25A (repealed 2013)). The Supreme Court concluded that the issue of the councilmember's removal was not a political question because the act didn't state expressly that the county council was the only arbiter of member qualifications. *Id.* at 401. The Court's reasoning in *Jones* applies here as well. Neither LG § 10-303 nor § 12-107 states expressly that the county alone is charged with removing county officers. And these provisions are not "textually demonstrable constitutional commitment[s]" of their sole authority to do so. *Jones*, 432 Md. at 401.

We note further that the Express Powers Act grants this authority to the local

27

legislative body, the Board as a body acting as a whole, not to individual commissioners. *See* LG §§ 10-303(c), 12-107(c); *see also River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 547 (2007) (holding that legislative body, not mayor, had express delegated authority to create special fees under Maryland constitution and statute, and local charter). The power of the Board to remove county officers has never been at issue in this case. In their complaint, the Commissioners didn't ask the circuit court to stop the Board from removing Mr. Belton. They asked the court to stop the Board from removing Mr. Belton with a vote that included Commissioner Coates—in other words, to enforce compliance with the PRA.[8] On multiple occasions the court stated that the other four members of the Board could, and should, carry on with the body's work. It made this suggestion during the parties' first motion hearing:

> [COUNSEL FOR PRESIDENT COLLINS]: the Court should not enjoin the Commission from having a conversation about whether the PRA is still valid or still needed and that the censured Commissioner should be allowed to — should be allowed to be — to partake in that conversation.
>
> [THE COURT]: But everything I hear here is we're still at the same spot . . . meaning, if I hear Counsel for the censured Commissioner, she says the vote would be three to two —

---

[8] In her brief, Commissioner Coates contends that courts cannot enjoin a legislator or a legislature from voting, citing two Maryland authorities as support—*Maryland-National Capital Park & Planning Commission v. Randall*, 209 Md. 18 (1956), and *Maryland Committee for Fair Representation v. Tawse*, 228 Md. 412 (1962). Neither case helps her. Again, the plaintiffs didn't call on the circuit court to enjoin the Board from taking a legislative or executive action—they asked the court to enforce the body's own action against a member after it determined that she should be excused from voting. As we explain further below, the Board acted within its authority when it excused Commissioner Coates from voting on matters pertaining to Mr. Belton's employment.

> isn't the cleaner way to let the people, let, remove the censured Commissioner, let the political body work as it would, albeit that they would be a two to two [vote] and maybe they work something out, maybe they don't.

And restated this view during the final motion hearing:

> [COUNSEL FOR COMMISSIONER COATES]: [I]f [Commissioner Coates] was able to vote on [the PRA], and she votes again, whether it is to rescind (inaudible) —
>
> [THE COURT]: But she can't vote, that is the part. . . . I recognize that [a vote on the PRA] is more than likely two and two, meaning you've got Patterson and Collins, two, and you've got Bowling and Stewart, two, (inaudible) okay? And those four can do what they want to do, I have said that from moment one of the ruling.

The circuit court understood its role and stayed within it. And we decline to hold that this case—which is about Commissioner Coates's authority to vote on Mr. Belton's employment—somehow presents a political question based on the full Board's statutory authority to remove county officers.

We have considered the remaining elements of the political question framework and remain unconvinced that this case oversteps. The Act, Maryland Rules, Charles County Code, the Rules, and the PRA all endowed the circuit court with the necessary standards to adjudicate the Commissioners' claims for equitable relief. No political decision or initial policy determination constrained the court from deciding the issues. *See Gresham v. Balt. Police Dep't.*, 261 Md. App. 723, 740–41, *cert. denied*, 489 Md. 159 (2024) (plaintiffs' attempt to invalidate a memorandum of understanding between the Baltimore Police Department and Johns Hopkins University revealed their true problem with the General

Assembly's policy judgment to create a police department in the university rather than an issue with statutory compliance or implementation).

*Finally*, a political question may be present when a court is asked to take an action that would undermine a coordinate branch of government. In *Smigiel v. Franchot*, 410 Md. 302 (2009), the Supreme Court considered whether an internal legislative dispute presented a political question. *Id.* at 304–09, 325. During an extraordinary session of the General Assembly, the Senate President and the Speaker of the House of Delegates consented to extend their adjournment so the House could finish working on five bills. *Id.* at 306–07. A House Member asked the House Parliamentarian whether the extension of adjournment violated the Maryland constitution, which required consent between the chambers for any adjournment lasting more than three days. *Id.* at 307–08. The House Parliamentarian rejected the member's challenge. *Id.* at 309. The member filed a complaint for declaratory judgment and injunctive relief in circuit court, which the court dismissed. *Id.*

On appeal, the House Member argued that consent to extend adjournment for more than three days requires consent from the House, sitting as a full legislative body, rather than the Speaker of the House. *Id.* at 321. Because the Senate had obtained consent from the Speaker, the Member asked the court to invalidate legislation passed during the extended legislative session. *Id.* at 321–22. The Supreme Court declined, holding that the issue was nonjusticiable as a political question because the House Member was asking the Court to tell the General Assembly how to follow its own consent rule. *Id.* at 325–26. The Court decided that weighing in on that question would fail to respect a coordinate branch of government and that the case concerned an internal procedural issue that the General

Assembly should resolve. *Id.*

This case didn't put the circuit court in the position to disrespect the Board. In *Smigiel*, the House Member asked the court to override the House Parliamentarian's ruling and invalidate the General Assembly's legislation based on the member's interpretation of the internal process required by the Maryland constitution. *Id.* at 321–22. Here, the Commissioners didn't ask the court to invalidate a decision, policy, or law that the Board had enacted. To the contrary, the Commissioners asked the court to enforce the Board's actions in the form of the PRA. When it came to voting, the court's focus remained on Commissioner Coates. The court didn't take the position that the Board's four other members couldn't vote on whether to fire Mr. Belton, rescind the PRA, or amend the Rules if they wanted to. And it would be illogical to conclude that the circuit court's involvement would undermine or disrespect the Board where the body voted unanimously to invoke the court's assistance with resolving this dispute. This case does not bear the indicia of a political question, and the court's legal conclusion to that effect was correct.

> 3. *The Board had the administrative authority to take prompt remedial action to resolve personnel disputes involving its county administrator, making the PRA a proper subject of injunction.*

*Third*, Commissioner Coates claims that the circuit court erred as a matter of law when it accepted the PRA as a valid exercise of the Board's administrative power and entered an injunction enforcing it. She contends that the PRA could not have been an administrative action because the Board didn't use it to implement another law already in force and effect. Alternatively, she argues that even if the PRA was an administrative

31

action, it was an unlawful basis for injunction because it was arbitrary and capricious. The Commissioners respond that personnel decisions are administrative acts because they are specific to the person involved. They argue that the Board used the PRA to apply federal, state, and local non-discrimination laws to Commissioner Coates. We hold that the Board had the administrative authority to take prompt and remedial action on matters affecting the county administrator's employment and, therefore, the PRA it took on June 9, 2020 can be enforced by an injunction.

Both parties suggest that the appropriate test for distinguishing between a county board's legislative and administrative actions is whether the action creates new law (legislative) or executes a law already in effect (administrative). The Supreme Court has used this test to make sense of nuanced actions taken by a county board that were not obviously administrative or legislative in nature. In *City of Bowie v. County Commissioners for Prince George's County*, 258 Md. 454 (1970), for example, a charter county board adopted a bond resolution to build an airport without public notice or hearing, and the Court had to decide whether the body had acted in an executive or legislative capacity. *Id.* at 458, 461. After the bond resolution, the board adopted a confirming resolution that ratified and approved both the bond resolution and another resolution that had accepted a specific buyer's offer to purchase. *Id.* at 459. Because the bond resolution could look like a legislative action at first blush, the Court turned to a "recognized test" to discern when a municipal ordinance is, in fact, legislative:

> "A recognized test for determining whether a municipal
> ordinance is legislative and so subject to referendum, or
> whether it is executive or administrative and is not, is whether

> the ordinance is one making a new law-an enactment of general application prescribing a new plan or policy-or is one which merely looks to or facilitates the administration, execution or implementation of a law already in force and effect."

*Id.* at 463 (*quoting Scull v. Montgomery Citizens League*, 249 Md. 271, 282 (1968)). Applying that test, the Court concluded that the board's adoption of the bond resolution effectuated a statutory mandate, rather than creating a new law, and, thus, amounted to an administrative or executive action. *Id.* at 461.

In *Queen Anne's Conservation, Inc. v. County Commissioners of Queen Anne's County*, 382 Md. 306 (2004), the Court had to decide whether the remedy available to a conservation group was immediate judicial review of the county board's action as a "local legislative body," or appeal of the board's administrative action through the established agency process. *Id.* at 318–20. The action at issue was the county board's approval and execution of a Development Rights and Responsibilities Agreement ("DRRA") with a prospective developer after a series of public hearings. *Id*. at 308, 312–18. Using the same test, the Court determined that initially the county commissioners had acted legislatively by passing an ordinance allowing DRRAs in the county, but that as to a particular DRRA, the body's statutory role of accepting the developer's petition, holding public hearings on it, and executing the DRRA was administrative. *Id.* at 326–27. In both *City of Bowie* and *Queen Anne's Conservation*, the test helped the Court decipher local actions that included or involved seemingly legislative actions.

Although we acknowledge that this test is one way of figuring out whether a county board's actions are administrative, we don't accept the broad premise that a board's action

only counts as "administrative" if it implements or enforces a "law already in force and effect." An action also can be administrative when it is "[o]f, relating to, or involving the work of managing a company or organization," *Administrative*, *Black's Law Dictionary* (11th ed. 2019), or is "[a] decision or an implementation relating to the government's executive function or a business's management." *Administrative Action*, *Black's Law Dictionary* (11th ed. 2019). Code county commissioners function as directors of a corporation, LG § 9-403, and board actions to establish internal protocols, adopt and implement bylaws governing board conduct, approve board meeting minutes, or make personnel decisions are quintessentially administrative, even if they don't implement or enforce laws that are binding on the greater public. *See, e.g.*, Md. Code (1975, 2014 Repl. Vol.), § 2-109(a)(1) of the Corporations & Associations Article ("CA") (after accepting articles of incorporation, directors must adopt bylaws); CA § 2-110(a) (bylaws may contain provisions "for the regulation and management of the affairs of the corporation"); CA § 1-101(q)(3) (1975, 2014 Repl. Vol., 2024 Cum. Supp.) (an internal corporate claim is one "[a]rising under the charter or bylaws of the corporation"); *see also Anastasi v. Montgomery Cnty.*, 123 Md. App. 472, 491 (1998) (if agency fails to follow administrative procedures affecting an individual's rights and obligations, then procedures have the force and effect of law and agency action is invalid); *Board of Sch. Commr's of Balt. City v. James*, 96 Md. App. 401, 421 (1993) ("[A]n agency's failure to follow mere 'internal administrative procedures' does not require reversal of an agency's action unless the complaining party can show substantial prejudice."). As the Court noted in *City of Bowie*, many functions of county commissioners are administrative or executive in nature. 258

Md. at 461.

We don't need to use this test, however, because the administrative nature of the PRA is obvious. The Board adopted the PRA in response to a specific personnel problem involving allegedly illegal conduct and took that measure to restrain specific conduct. It pertained directly to the Board's management of its own members as it made county personnel decisions. Moreover, the Board's Rules authorized the body to restrict a member's ability to vote. The Rules provide that "[b]oard members may be excused from casting a vote for reasons such as a perceived or actual conflict of interest, or for other reasons where . . . the County Attorney believe[s] voting would be inappropriate." After Ms. Sargeant presented her factual findings to the Board, both the county attorney and outside counsel[9] advised the body to restrain Commissioner Coates from voting on any employment matter pertaining to Mr. Belton. The Board followed that legal advice and excused Commissioner Coates from voting, as the Rules permitted. The Board's action also was consistent with its personnel policy on equal employment opportunity. *See* Charles County, Md., Code § 148-1 (1981) (affirmative action policy statement); *Id.* § 148-3 (statement of legal mandates under anti-discrimination laws). Under these circumstances, we are comfortable classifying the PRA as an administrative action and

---

[9] Mr. Paltell served as the Board's outside counsel for employment matters. At the preliminary injunction hearing, Commissioner Stewart testified that he is one of the Board's trusted attorneys and that he and County Attorney Adams spoke to the Board about liability exposure after Ms. Sargeant presented her findings. Commissioner Collins testified that Mr. Paltell billed the county for his services in preparing and advising on the PRA and that he and County Attorney Adams had worked together to advise the Board.

reject the view that it isn't simply because the Board also has powers as a legislative body. *See 2BD Assocs. Ltd. P'ship v. Cnty. Comm'rs for Queen Anne's Cnty*, 896 F.Supp. 528, 532 (D. Md. 1995) ("[A]n official with title of legislator does not receive absolute immunity for actions that are administrative in nature, and conversely, an official whose title is that of an executive will receive absolute immunity for actions which are legislative in nature.").[10]

The Board had the administrative authority to vote on and adopt the PRA. An employer can take prompt and adequate remedial action to defend its organization from liability for hostile work environment claims. *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) ("Title VII"); *Franovich v. Hanson*, 687 F.Supp.3d 670, 686 (D. Md. 2023) (adopting "'an effective anti-harassment policy is an important factor in determining whether [an employer] exercised reasonable care' to prevent discrimination or retaliation" (*quoting Smith v. First Union Nat'l Bank*, 202 F.3d 234, 244 (4th Cir. 2000))); *Hammoud v. Jimmy's Seafood, Inc.*, 618 F.Supp.3d 219, 235 (D. Md. 2022) ("A hostile

---

[10] Having agreed with the circuit court that the PRA was an administrative action, we decline Commissioner Coates's invitation to hold that the court erred in not recognizing the PRA as an unconstitutional bill of attainder, which would be legislative. *See, e.g.*, *Hammond v. Frankfeld*, 194 Md. 487, 490 (1950) (defining a bill of attainder as a "condemnation or punishment by legislative action without trial or judicial determination"); *Shub v. Simpson*, 196 Md. 177, 185, 194–95 (1950) (review of challenge to Subversive Activities Act as an unlawful bill of attainder); *Anderson v. Baker*, 23 Md. 531, 604 (1865) (describing bills of attainder as "special Acts of the Legislature, inflicting capital or other punishments upon persons supposed to be guilty of an offence, without any conviction in the ordinary course of judicial proceedings"); *United States v. Brown*, 381 U.S. 437, 442 (1965) ("[T]he Bill of Attainder Clause was intended . . . as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature.").

work environment may be imputed to a defendant if the plaintiff engaged in protected activity sufficient to put the defendant on notice of a violation of Title VII and the defendant did not 'respond with remedial action.'" (*quoting E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008))); *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 345–46 (2000) (a principal issue in assessing liability for hostile work environment claims is whether the employer's officials had actual or constructive notice of the unlawful conduct and failed to protect the employee from it). And prompt remedial action is an effective way to protect an organization. *See Spicer v. Va. Dept. of Corr.*, 66 F.3d 705, 711 (4th Cir. 1995) (if an employer's prompt and remedial action stops the complained of conduct, "liability must cease as well").

On this record, there is no dispute that on June 9, 2020, Ms. Sargeant put the Board on actual notice of her investigative conclusion that Commissioner Coates had subjected Mr. Belton to a hostile work environment motivated by racial animus. Nor is there any dispute that the Board responded by adopting the PRA for the purpose of limiting Commissioner Coates's interactions with Mr. Belton and her authority to influence the terms, conditions, or future of his employment for the county. The Board has an employment relationship with the county administrator—the administrator literally is the only officer in county government that the body can hire and fire.

Commissioner Coates takes the position, however, that Mr. Belton is not an "employee" entitled to protection under state and federal employment laws, but instead is a "political appointee." She contends, therefore, that the circuit court erred in finding an injunction necessary to avoid the irreparable harm of Mr. Belton bringing an actionable

retaliation claim against Charles County and the Board.

To answer the question of whether a person is an "employee" covered by Title VII, we examine its statutory language, legislative history, federal case law, and the circumstances of the case. *See Curl v. Reavis*, 740 F.2d 1323, 1327 (4th Cir. 1984).[11] Title VII defines an "employee" as "an individual employed by an employer . . . ." 42 U.S.C. § 2000e(f). Admittedly, that sentence sounds somewhat circular, but for our purposes what matters is that the definition excludes elected officials and high-level officers working closely with them to conduct their official duties:

> [T]he term "employee" shall not include any person elected to public office . . . by the qualified voters . . . or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

*Id.*[12] In essence, the exception to employee status includes four categories of people. *See id.*; *see also Curl*, 740 F.2d at 1328; *Gregory v. Ashcroft*, 501 U.S. 452, 484–85 (1991) (White, J., concurring in part). The "common usage of the term 'policy making level' refers to high level officials who play an active role in formulating or implementing governmental objectives." *Reardon v. Herring*, 191 F.Supp.3d 529, 538 (E.D. Va. 2016).

When Congress first passed Title VII, the definition of "employee" didn't contain

---

[11] Because there are no reported opinions from our courts on the issue of employee status under Title VII or FEPA, we have consulted federal case law for guidance on the statutory exception.

[12] FEPA's definition of "employee" mirrors the language in Title VII, excluding "appointee[s] on the policy making level . . . ." *See* SG § 20-601(c)(2)(ii).

any exceptions. *See* Civil Rights Act of 1964, Pub. L. No. 88-352, § 701, 78 Stat. 241, 255 (1964).[13] During a Senate discussion of H.R. 1746, the Equal Employment Opportunities Enforcement Act, H.R. 1746, 92nd Cong. (1971), a bill that would amend Title VII, a question arose about whether Title VII would limit a governor's ability to appoint cabinet officials and hire personal aides from a preferred political party. *See* S. Rep. No. 92-415, at 11 (1971). The committee reviewing the Senate version of the bill assured that it didn't intend to prohibit appointments on that basis, only those motivated by unlawful discrimination. *Id.* The concern broadened to include how the bill would intrude on state sovereignty by dictating whom governors, county sheriffs, or other state officials could or could not hire. *See* 117 Cong. Rec. 38,402 (1971); 118 Cong. Rec. 308–11 (1972). The Senate discussed the possibility of amending the bill to exclude elected officials, their personnel, and staff "at the top decision-making levels in the executive and judicial branch" from the reach of Title VII more expressly. 118 Cong. Rec. 1,838 (1972).

Senator Ervin introduced amendment no. 888 to modify the definition of "employee" by excluding staff hired to advise on the exercise of the constitutional or legal

---

[13] Title VII also didn't include state and local governments in the definition of "employer." *See* Civil Rights Act of 1964, Pub. L. No. 88-352, § 701, 78 Stat. 241, 255 (1964). Congress extended Title VII protections to state and local government employees in 1972. *See* Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 2, 86 Stat. 103, 103 (1972); H.R. Rep. No. 92-238, at 18 (1971) ("The Constitution is as imperative in its prohibition of discrimination in state and local government employment as it is in barring discrimination in Federal jobs."); *see id.* at 19 ("The Constitution has recognized that it is inimical to the democratic form of government to allow the existence of discrimination in those bureaucratic systems which most directly affect the daily interactions of this Nation's citizens.").

powers of the elected official's office. *Id.* at 4,095. The amendment sought to exclude the elected official and their advisor but not the personnel who executed the advice. *Id.* at 4,096–97. During debate of the amendment, the body agreed that the exclusion should focus on individuals in a close working relationship with the elected official:

> [Senator Williams]: [T]he purpose of the amendment, to exempt from coverage those who are chosen by the Governor or the mayor or the county supervisor, whatever the elected official is, and who are in a close personal relationship and an immediate relationship with him. Those who are his first line of advisers. Is that basically the purpose of the Senator's amendment?

> [Senator Ervin]: . . . I feel that those elected officials who are legal advisers or who are personal assistants or legal advisers, as to how he should exercise his constitutional, legal rights and responsibilities, should also be exempt. That is the purpose of the amendment, yes.

> [Senator Williams]: That is my understanding. As to the degree, certainly it would cover those who are in a Governor's cabinet, his cabinet officers. They would be included in the group of personal assistants; is that not correct?

> [Senator Ervin]: That is what is intended by this amendment, plus his immediate legal advisers, because no Governor today can get along and discharge the many duties imposed upon him by his office without having someone to lean on for advice, counsel, and so forth.

*Id.* at 4,492–93. The Senate passed a slightly modified version of amendment no. 888. *Id.* at 4,494. When H.R. 1746 emerged from the conference committee, the exception had broadened to include appointees with policymaking authority. *See* S. Rep. No. 92–681, at 15 (1972); Equal Opportunity Act of 1972, Pub. L. No. 92-261, § 2, 86 Stat. 103, 103 (1972); 118 Cong. Rec. 7, 567 (1972). The conference managers submitted a joint

statement of their thinking relative to the policymaking exception:

> It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisors or to policymaking positions at the highest levels of the departments or agencies of State or local governments, *such as cabinet officers, and persons with comparable responsibilities at the local level. It is the conferees intent that this exemption shall be construed narrowly*.

S. Rep. No. 92–681, at 15–16 (1972) (emphasis added); H. Rep. No. 92–899, at 15–16 (1972).

The Fourth Circuit has resolved an employee's status relative to "personal staff" but not the "policymaking" exception. *See, e.g.*, *Curl*, 740 F.2d at 1328; *Brewster v. Barnes*, 788 F.2d 985, 989–90 (4th Cir. 1986) (evaluating identical language in the Equal Pay Act ("EPA") to decide whether the statutory definition of "employee" excluded female correctional officer); *see also Marburger v. Upper Hanover Twp.*, 225 F.Supp.2d 503, 510 (E.D. Pa. 2002) (looking to case law analyzing the EPA, Title VII, and other anti-discrimination laws with similar statutory definition of "employee" to decide whether plaintiff was excepted from EPA coverage). As a result, we turn to other federal courts for guidance in this area.

In *Reardon v. Herring*, 191 F.Supp.3d 529 (E.D. Va. 2016), the United States District Court for the Eastern District of Virginia explored the legislative history of the policymaking exception and three distinct approaches that have been adopted by the United States Court of Appeals for the Seventh, Second, and Eighth Circuits. *Id.* at 538–40. The Seventh Circuit interprets the exception broadly, to cover a position that "'authorizes,

either directly or indirectly, meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation.'" *Id.* at 539 (*quoting Americanos v. Carter*, 74 F.3d 138, 141 (7th Cir. 1996)); *see Opp v. Off. of State's Att'y of Cook Cnty.*, 630 F.3d 616, 619 (7th Cir. 2010).[14] The Second Circuit has decided that the exclusion applies only to appointees that "'normally work closely with and [are] accountable to the official who appointed them.'" *Reardon*, 191 F.Supp.3d at 539 (*quoting Butler v. New York State Dep't of Law*, 211 F.3d 739, 748 (2d Cir. 2000)). The Eighth Circuit has employed an intermediate approach where the question of whether one is an appointee on the policymaking level depends on "the extent to which the plaintiff's position is 'entrusted with extensive decisionmaking authority and discretionary power[.]'" *Id.* at 540 (*quoting Gregory v. Ashcroft*, 898 F.2d 598, 603 (8th Cir. 1990), *aff'd*, 501 U.S. 452 (1991)). In the Eighth Circuit, factors that can assist the inquiry include "'whether the [appointee] has discretionary, rather than solely administrative powers'" and "'whether the [appointee] formulates policy.'" *Id.* (*quoting Gregory*, 898 F.2d at 604).[15]

---

[14] The Seventh Circuit uses this test to evaluate an employee's status under both Title VII and First Amendment patronage dismissal claims. *See Americanos*, 74 F.3d at 144 ("[W]e have held that 'the reasons for exempting the office from the patronage ban apply with equal force to the requirements of the [Age Discrimination in Employment Act ("ADEA")] [and Title VII].'" (*quoting Heck v. City of Freeport*, 985 F.2d 305, 310 (7th Cir. 1993))); *Opp*, 630 F.3d at 620 (declining to distinguish between how plaintiffs could be "policymakers" under the First Amendment and the ADEA).

[15] In the Eighth Circuit, another possible factor is whether the appointee "'serves at the pleasure of the appointing authority . . . .'" *Reardon*, 191 F.Supp.3d at 540 (*quoting Gregory*, 898 F.2d at 604). But the Fourth Circuit has not been persuaded on the relevance of this factor, *see Curl*, 740 F.2d at 1328 (a property interest in employment is not a condition precedent to bringing a Title VII claim (*citing Lewis v. Blackburn*, 734 F.2d 1000, 1004 (4th Cir. 1984))), so we don't weigh that factor in our analysis.

*Reardon* adopted the intermediate approach because of its consistency with Title

VII's statutory text, alignment with congressional intent, and ability to consider particular

circumstances flexibly:

> [T]he Eighth Circuit's approach is consistent with the ordinary meaning of the statutory text and follows logically from the plain language of the statute, by examining not whether an appointee is a policymaker, but rather, whether an appointee is "on the policymaking level." Under this framework, whether an appointee actually "makes policy" is a factor to be considered, but the fact that an appointee does not "make policy" in the traditional sense is not dispositive. . . . [The Eighth Circuit's] commonsense focus on the appointee's decision-making authority and whether the appointee's position is one that actually influences formulation of policy necessarily guides courts toward results that stay true to the clear and well-documented congressional intent that the exception be very narrowly construed. . . . [T]he Eighth Circuit's test is flexible and appropriately sensitive to the fact-specific nature of this inquiry, without leading to conflation with, or consumption of, either of the surrounding statutory exceptions, which exempt an elected official's personal staff and immediate legal advisers from . . . coverage.

*Id.* at 540 (citations omitted).

We agree that the intermediate approach responds most directly to the statutory

language and legislative history of Title VII.[16] The expansive scope of the Seventh

Circuit's approach conflicts with Congress's intent that the exception be narrowly

---

[16] Although the Fourth Circuit has not yet spoken on the appropriate test for assessing whether the policymaking exception applies, the United States District Court for the District of Maryland answered this question in *Bynum v. Martin*, No. GJH-16-2067, 2016 WL 7468050 (D. Md. Dec. 27, 2016). Finding *Reardon* instructive, the Court applied the Eighth Circuit test to a Title VII claim, concluding ultimately that the plaintiff was not an "appointee on the policymaking level" under Title VII and FEPA. *Id.* at *3–5. The opinion is not binding precedent but has persuasive value here. *See* Md. Rule 1-104(b).

construed. The Second Circuit's focus on whether a person works closely with, or is accountable to, the appointing official opens the exception up to a wide range of positions and, essentially, compresses "personal staff," "immediate advisors," and "appointees" into one group. From Title VII's legislative history—particularly the exchanges between Senator Ervin and Senator Williams and the changes made to H.R. 1746 during conference committee—we know that Congress created the exception with four discrete groups of people in mind.[17] For these reasons, we will apply the Eighth Circuit test to consider the extent to which the Board entrusted Mr. Belton, as County Administrator, with extensive decision-making authority and discretionary power.

A review of the Charles County Code reveals that the county administrator acts primarily as an administrative vessel for the Board's programs and policy priorities and has little discretionary power on policy matters. For example, the Board has an affirmative action policy regarding its commitment to Equal Employment Opportunity ("EEO") and anti-discrimination laws and has adopted an Affirmative Action Plan ("AAP"). Charles County, Md., Code § 148-1 (1981). Although the Board has overall responsibility for implementing the AAP, it has delegated those responsibilities to the personnel officer/EEO

---

[17] We notice, too, that the flexibility of the Eighth Circuit's test happens to align with the fact-dependent assessments favored by the Fourth Circuit in its consideration of the personal staff exception. *See Curl*, 740 F.2d at 1328 ("Whether [plaintiff] is to be treated as a member of the Sheriff's personal staff requires a careful examination of the nature and circumstances of her role in the Sheriff's Department."); *Brewster*, 788 F.2d at 990 (assessing whether the personal staff exception applies is a "case-by-case inquiry"); *United States v. Gregory*, 818 F.2d 1114, 1117 (4th Cir. 1987) (the personal staff exception requires a careful examination of the facts of the case).

coordinator. *Id.* §§ 148-1(E), 148-5(B). The county administrator's duties in this area are to provide positive management direction for accomplishing and implementing the Board's policy objectives, supervise the EEO coordinator, and analyze all related data. *Id.* § 148-5(A). As another example, the Board's policy on standards of workplace conduct provides that disciplinary action may be necessary to ensure efficient government operation and that "[f]air discipline for proper cause, which treats all employees alike, is essential." Charles County, Md., Code § 197-14 (1983). The county administrator's role in implementing that policy is to approve virtually all disciplinary actions before they can be taken by a department head or supervisor. *Id.* § 197-15. One more example is the county's establishment of a voluntary deferred compensation plan, where the county administrator has the authority to execute individual participation agreements with employees, act as plan administrator, and otherwise implement the program. Charles County, Md., Code §§ 162-1, 162-2 (1980). Although these actions necessarily involve day-to-day decision making, they are predominantly administrative, like many of the county administrator's functions. *See, e.g.*, Charles County, Md., Code § 197-2 (1972) (receive monthly employee attendance records from department heads); *Id.* § 197-4(D) (forward requests for exception to annual leave policy to Board for special action); Charles County, Md., Code § 97-1(B) (1989) (assign duties to Department of Planning and Growth Management, Department of Public Facilities, and Department of Utilities). The testimony of Commissioner Stewart and President Collins at the preliminary injunction hearing also portrayed the county administrator position as administrative:

> [COMMISSIONER STEWART]: [W]hen we set our goals and

45

objectives for the county, we give those to the county administrator, and then the county administrator's job is to work with staff over the four years to enact our goals and objectives.

* * *

The county administrator is responsible for the administrative running of the county, daily. The county administrator is also responsible for working with the county commissioners and understanding and setting our goals and objectives for the four years . . . .

* * *

[PRESIDENT COLLINS]: [The county administrator's] responsibilities are administratively leading the county. . . Employment matters, decisions associated with the day to day operations.

Indeed, the administrative core of the county administrator's duties is evident from the position's description in Mr. Belton's employment contract with the Board:

The County Administrator shall be the Chief Administrative Officer of Charles County Government . . . to be responsible to the County for the management of all county affairs that are placed in Employee by charge of law and the County Commissioners' Rules of Procedure adopted January 8, 2019 . . . including but not limited to responsibility for the daily planning, directing and reviewing of all operations within the County; providing overall supervision of department actions, personnel matters, budgetary and fiscal procedures and routine administrative actions in accordance with policies and procedures as authorized and directed by the Charles County Commissioners.

As described in the Rules, the administrator's duties, while far reaching, demanding, and extensive, do not involve the formulation of public policy and are, first and foremost, administrative:

The County Administrator . . . is responsible to the Board of

46

Commissioners for the day to day management and operation of Charles County Government. The County Administrator reports directly to the Commissioner President for day-to-day operations. . . . The County Administrator will attend all Board of Commissioners meetings and shall have no vote.

The County Administrator manages County Government and executes and implements the directives, initiatives and policies of the Board of Commissioners . . . . The County Administrator supervises the administration of all departments, offices, or agencies of the county . . . . The County Administrator is authorized to act, and is responsible for, all personnel actions . . . .

\* \* \*

The County Administrator will prepare and submit to the County Commissioners . . . the County's Annual Budget to achieve the Commissioners' Goals and Objectives and implement the final approved budget. In addition, the County Administrator will report on all fiscal, operational and administrative activities of the County . . . .

The County Administrator shall be appointed by majority vote of the Board of Commissioners and chosen by the Board . . . *solely on the basis of executive and administrative qualifications . . . .*

(Emphasis added).

As the county's chief administrative officer, the county administrator naturally must exercise discretion when managing day-to-day operations. According to the Charles County Code, the county administrator chairs a three-member grievance board for employees and sits on a nine-member board that hears claims for disability retirement income for employees of the sheriff's office. Charles County, Md., Code § 197-23(A) (1983); Charles County, Md., Code § 210-27(A)–(B) (1997). The county administrator attempts to resolve disputes. *See* Charles County, Md., Code § 271-6(H) (1982) (resolve

senior citizens club disputes referred by Director of Aging Services and, if necessary, advance to the Board); Charles County, Md., Code § 27-2(E) (2003) (resolve expense reimbursement disputes between fiscal director and commissioner or refer to Board for resolution); Charles County, Md., Code § 203-2(A)(1) (2023) (resolve procurement specification disputes between fiscal director and department). The officer's exercise of discretion largely involves internal affairs or, in some instances, the referral of enforcement actions. *See* Charles County, Md., Code § 203-1(R) (2023) (county administrator can take administrative action or refer matter to county attorney when put on notice that procurement policies or procedures have been violated); Charles County, Md., Code § 226-13(E) (2015) (county administrator can conduct informal hearing on alleged franchisee violation prior to revocation; if matter isn't resolved, then franchisee can request Board hearing).

The county administrator's inward-focused duties stand in sharp contrast with the Board's public-facing role and extensive policymaking power, authority, and obligations:

1) To adopt an Annual Budget to fund the operations of Charles County Government and associated County Agencies;

2) To adopt and update the County's Land Use Plan and Zoning Ordinances . . . and to serve as an appeal board as required.

3) To oversee development and land use issues by reviewing the Annual Report of the Planning Commission and meeting annually with the Charles County Planning Commission in open session.

4) To deliver services to citizens, maintain and construct county infrastructure, facilities, parks, and all County

48

properties and amenities, in a fiscally responsible manner . . . .

5) To serve as the Charles County Board of Health by protecting the public health through funding of the Health Department and oversight of the Charles County Health Officer;

6) To protect the safety and welfare of the Charles County citizens by funding and supporting the Charles County Sheriff's Office.

7) To fund the Charles County Board of Education . . . .

8) To accept assignments and to serve on Boards, Commissions, Task Forces and Committees . . . .

9) To establish Commissioners' Goals and Objectives as the basis for the operation of Charles County Government to include the associated budgetary and policy related decisions . . . .

*See also* LG §§ 10-102(b), 10-301 *et seq*. At his deposition, President Collins described the Board as "the policy makers for Charles County government [who] decide on the budget, which sets those resources that are necessary in operating government. That includes making decisions as it relates to public safety, public education, [and] road improvements . . . ."

On the record before us, the Board has not delegated any policy authority to the county administrator. The administrator's powers are mostly executive, and the position does not play a role in formulating public policy for the county. The Board has not entrusted the county administrator with the kind of high-level responsibilities that an appointee on the policymaking or cabinet level would possess—*i.e.*, decision making authority and discretionary power on high-impact issues of public interest and importance. *See Gregory*,

501 U.S. at 453. Mr. Belton is, therefore, an "employee" under Title VII and the Board had a legal obligation to take remedial action when it became aware of Ms. Sargeant's investigative conclusion that he had been subjected to a hostile work environment by Commissioner Coates on account of his race.

Lastly, Commissioner Coates asks us to hold that the PRA (and necessarily, the injunction) are invalid under the First Amendment to the Constitution of the United States. Her arguments hinge on the position that the PRA was a legislative action. But because we have determined that the PRA was an administrative action rather than a law enacted by the Board, a First Amendment analysis is unnecessary. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . ."); *see also Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125–26 (2011) (rejecting notion that a state's recusal rules violate legislator's first amendment rights and holding that "[r]estrictions on legislators' voting are not restrictions on legislators' protected speech").

4. *The evidence of record sustained sufficiently the circuit court's findings in favor of entering a permanent injunction.*

*Fourth*, Commissioner Coates claims that even if the permanent injunction was proper as a matter of law, there was insufficient evidence to warrant its entry. More specifically, she contends that there wasn't enough evidence for the court to find that the balance of potential harm weighed in the appellees' favor, that the appellees would suffer irreparable harm, or that an injunction would be in the public interest.

A circuit court weighs four factors to decide whether a preliminary injunction is appropriate: (1) the plaintiff's likelihood of succeeding on the merits of their claim; (2) the

"'balance of convenience,'" meaning whether the defendant would suffer more injury from granting an injunction than would result from its denial; (3) whether the plaintiff will suffer irreparable injury if relief isn't granted; and (4) the public interest. *Ehrlich v. Perez*, 394 Md. 691, 707–08 (2006) (*quoting Department of Transp., Motor Vehicle Admin., v. Armacost*, 299 Md. 392, 404–05 (1984)). If we were reviewing a court's decision to grant a preliminary injunction, we would consider whether the judge "'exercised sound discretion in examining [these] four factors . . . .'" *Id.* at 707 (*quoting LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 300 (2004)). In this case, however, the factors don't guide our review because the court's final judgment was a permanent injunction that adjudicated the merits of the appellees' claims. *See Talbot Cnty.*, 370 Md. at 135–36 (*citing El Bey*, 362 Md. at 354).

A preliminary injunction is an injunction "granted after opportunity for a full adversary hearing on the propriety of its issuance but before a final determination of the merits of the action." Md. Rule 15-501(b). A court cannot enjoin a party preliminarily without first giving notice to all parties and an opportunity for a "full adversary hearing" on whether a preliminary injunction should issue. Md. Rule 15-505(a). The rules empower the court to consolidate a trial on the merits with the preliminary injunction hearing "before or after commencement of [that] hearing," as long as jury rights remain preserved. Md. Rule 15-505(b). Importantly, the court can grant an injunction "at any stage of an action and at the instance of any party or on its own initiative" on "the terms and conditions justice may require." Md. Rule 15-502(b); *see also* Md. Rule 15-501(a) (defining "injunction" as "an order mandating or prohibiting a specified act").

51

On December 30, 2022, the Commissioners filed a complaint asking the circuit court to issue a "Temporary Restraining Order, Permanent Injunction, and Declaratory Judgment, or, Alternatively, Writ of Mandamus and/or Prohibition." On February 15, 2023, the court entered the temporary restraining order.[18] And on September 8, and 18, 2023, the court heard the evidence and the parties' closing arguments for and against entry of a preliminary injunction. *See* Md. Rule 15-505(a).

On September 21, 2023, the court convened an oral opinion hearing to announce its ruling on the issue of "whether or not a permanent injunction should be granted." The court addressed Commissioner Coates's legal arguments, analyzed each of the requisite factors—likelihood of success on the merits, balance of convenience, irreparable harm, and the public interest—and concluded by "grant[ing] the plaintiff's request for a permanent injunction." The Commissioners' counsel asked the court to clarify its intention to issue a permanent, rather than preliminary injunction, which it affirmed. No parties objected. Commissioner Coates followed up with a motion for reconsideration to change the ruling to a preliminary injunction, and the court heard that motion on October 13, 2023.

At the motion hearing, Commissioner Coates argued that additional discovery was necessary for the court to decide the merits of the appellees' claims. She asked to be heard on her counterclaim for a declaratory judgment that the Board had, in fact, terminated Mr. Belton's employment on December 13, 2022. She argued that the Commissioners' claims

---

[18] The parties consented to waive the time requirement for the merits hearing. *See* Md. Rule 15-504(c).

for mandamus relief and request for declaratory judgment that Commissioner Coates had violated SG § 20-801 remained outstanding.[19] And she objected to the lack of advance notice that the evidentiary hearing would be for a permanent, rather than a preliminary, injunction.

In response, the Commissioners argued that modifying the ruling would prolong litigation unnecessarily at great expense to county taxpayers. They emphasized that the evidence submitted to the court supported a permanent injunction fully and that a second merits hearing would be redundant, that Commissioner Coates hadn't identified other discoverable evidence that could make a difference in the outcome given the court's conclusion that the PRA was enforceable, and that Commissioner Coates had adequate notice that their complaint sought a permanent injunction and that there would be an evidentiary hearing on the merits of that request. As to Commissioner Coates's counterclaim, the Commissioners argued that the court had disposed of her claim—seeking a declaration that the Board had fired Mr. Belton in December 2022—implicitly when it ruled that the PRA was enforceable because even if a vote had occurred, it would have been illegal. The Commissioners maintained that there was nothing left for the court to decide and that the permanent injunction was a sound exercise of the court's discretion.

The only specific discovery need Commissioner Coates identified during the hearing was her interest in taking Commissioner Stewart's deposition. And the circuit court

---

[19] In Count IV of their complaint, the Commissioners alleged that Commissioner Coates tried to incite the Board to discriminate against Mr. Belton on December 13, 2022, in violation of FEPA.

noted that Commissioner Stewart had testified at the evidentiary hearing and had been subjected to cross-examination. The court dismissed the appellees' remaining claims at their request and considered Commissioner Coates's arguments for conducting discovery and adjudicating her counterclaim at length. The court decided that a judgment declaring that the Board had terminated Mr. Belton's employment on December 13, 2022 would be irreconcilable with its finding that the PRA barred Commissioner Coates from taking that vote. The court opined as well that such a judgment would conflict with the evidence in the record. President Collins testified that no vote had been taken, and the Board's meeting minutes showed that the body tried to fire Mr. Belton. The legality of that vote was challenged, and the Board responded by voting to place Mr. Belton on administrative leave and to authorize the Commissioners to bring the present suit. Seeing no reason to change the permanent injunction, the court denied Commissioner Coates's motion for reconsideration and dismissed her counterclaim.

The circuit court exercised its discretion appropriately. An abuse of discretion is a judgment that is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Schade v. Md. State Bd. of Elections*, 401 Md. 1, 34 (2007) (*quoting Jenkins v. City of Coll. Park*, 379 Md. 142, 165 (2003)). The court had sound reasons in this case for consolidating the preliminary injunction hearing with the merits trial. The Board and the Commissioners' core objective was to have the court decide whether Commissioner Coates had the authority to vote on Mr. Belton's employment in December 2022 or, put differently, whether the PRA was binding and effective. Through a series of legal challenges, Commissioner Coates contended that the PRA was never valid and

54

couldn't be the subject of an injunction (*i.e.*, couldn't be enforced). At the opinion hearing, the court responded to all her legal challenges first, finding ultimately that the Board had the administrative authority to enact the PRA. Then the court found that the PRA remained in effect and enforceable because the body hadn't established an end date for it and had never taken a vote to modify or rescind it. When the circuit court made those findings, it had adjudicated the merits of the appellees' core claims in full and resolved the central controversy between the Board's members completely. Deciding whether interim injunctive relief was appropriate under the four factors was no longer necessary.

The circuit court's action satisfied its obligations under the Maryland Rules. The court provided notice and opportunity for a full adversary hearing on whether an injunction should issue. After a day and a half of hearings, combined with the October 13 motion hearing, the court concluded that further litigation was unnecessary. Courts have the discretion to consolidate a preliminary injunction hearing with a merits trial, Md. Rule 15-505(b), and the rules do not require advance notice of consolidation. The absence of a notice requirement aligns with the court's general power to grant an injunction at "any stage of an action" or "on its own initiative" when justice requires such action. Md. Rule 15-502(b).

The circuit court's judgment on the merits of the appellees' claims for declaratory and injunctive relief relied on sufficient evidence. Again, the heart of the dispute between the parties was whether the PRA barred Commissioner Coates from trying to fire Mr. Belton in December 2022. Apart from the allegations sustaining Commissioner Coates's counterclaim, none of the facts pertaining to the Board's actions on June 9, 2020 and

55

December 13, 2022 were in dispute. And the evidence adduced at the September hearings established that the Board had not voted to rescind or modify the PRA at any point before December 13, 2022 and that the PRA didn't sunset or terminate on its own. So after reaching its legal conclusions—namely, that the appellees had standing, that the case did not present a political question, that Mr. Belton was an "employee" under federal law, and that the Board possessed the authority to adopt the PRA—and finding that the PRA remained in effect on December 13, 2022, the court had ample evidence to render a final judgment on the appellees' claims.

In the circuit court's view, there was no reason to proceed with adjudicating Commissioner Coates's counterclaim. We agree on the merits, but there is one procedural wrinkle. The court decided that its findings of fact on the appellees' claims precluded any declaratory relief that it could enter in Commissioner Coates's favor and that the relief she sought conflicted with the evidence. Having found that the PRA was binding and in effect on December 13, 2022, the court determined that it couldn't also grant declaratory relief validating a Board vote to fire Mr. Belton that included Commissioner Coates. In other words, the court appeared to conclude that its decision to issue a permanent injunction effectively mooted Commissioner Coates's counterclaim. *See Powell v. Md. Dep't of Health*, 455 Md. 520, 539 (2017) ("A case is moot if 'there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.'" (*quoting Mercy Hosp., Inc. v. Jackson*, 306 Md. 556, 561 (1986))). We hold that the circuit court did not err or abuse its discretion when it granted a permanent injunction in the appellees' favor. Even so, the circuit court erred in a narrow procedural

56

way. Rather than dismissing Commissioner Coates's counterclaim for a declaratory judgment, the court should have entered a declaratory judgment embodying its conclusions that she was not entitled to relief as a result of its findings and conclusions on the Commissioners' claims. *See Broadwater v. State*, 303 Md. 461, 468 (1985). This is resolved easily: as we often do, we vacate the portion of the judgment dismissing Commissioner Coates's counterclaim and remand for entry of a declaratory judgment consistent with the circuit court's original findings and conclusions, as affirmed in this opinion.

## B. The Circuit Court's Discovery And Evidentiary Rulings Were Not An Abuse Of Discretion Because Evidence About Whether The Board Should Have Adopted The PRA Was Irrelevant.

In her final arguments, Commissioner Coates suggests that the court stymied her efforts to discover and admit evidence examining the validity of the PRA. More specifically, she argues that the court abused its discretion when it quashed her subpoenas to Ms. Sargeant, rejected evidence she attempted to adduce at the preliminary injunction hearing, and denied her motion to compel County Attorney Adams's deposition testimony.

"[T]he administration of discovery rules is within the sound discretion of the trial judge." *Public Serv. Comm'n of Md. v. Patuxent Valley Conservation League*, 300 Md. 200, 216 (1984). Abuse of that discretion occurs when the court's action isn't tied to "'any guiding rules or principles,'" is irreconcilable with "'the logic and effect of facts and inferences'" before it, or defies fact and logic. *Bord v. Balt. Co.*, 220 Md. App. 529, 566 (2014) (*quoting In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312 (1997)). Ultimately, the court is responsible for ensuring that "matters which either are not relevant

or are subject to a privilege are not discoverable." *Patuxent Valley*, 300 Md. at 216.

Under Maryland Rule 5-401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Because evidence that isn't relevant isn't admissible, Md. Rule 5-402, "trial judges do not have discretion to admit irrelevant evidence." *State v. Simms*, 420 Md. 705, 724 (2011). When we review discovery and evidentiary rulings on relevance, we apply a *de novo* standard of review to the court's legal conclusion "that the evidence at issue is or is not 'of consequence to the determination of the action.'" *Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594, 620 (2011) (*quoting Parker v. State*, 408 Md. 428, 437 (2009)); *see J.L. Matthews, Inc. v. Md.-Nat'l Park & Plan. Comm'n*, 368 Md. 71, 93 (2002) (reviewing *de novo* a court's grant of a motion *in limine* based on its interpretation of the scope of condemnation proceedings).

Throughout the proceedings in the circuit court, Commissioner Coates attempted to challenge the integrity of Ms. Sargeant's investigation and the correctness of the Board's decision to adopt the PRA in the first place. From the outset of litigation, the court insisted that it would not review the Board's original findings or the Sargeant investigation. When Commissioner Coates attempted to subpoena Ms. Sargeant and her firm for documents and information related to the investigation, the court rejected this expansion of the issues on relevance grounds:

> The Board's position is that their request for quashing the subpoena's[sic] . . . "represents an ideal opportunity for the Court to reign in what otherwise promises to be further bloating of an already tortured litigation history." The court agrees! The court made this abundantly clear in the hearing on

> January 24, 2023. What has been decided and found is found. We are not going back but forward! To allow discovery down this path is extremely costly and will not reveal material that is relevant to this proceeding which is injunctive relief.

(footnote omitted). When the Commissioners brought their case-in-chief at the evidentiary hearing, the court reinforced its view on relevance, stating "we are not going to attack [the PRA], we are not going to go back, we are going to go forward. Those are my words that I wrote, and that is what we are going to do here." The court allowed Commissioner Coates to conduct a limited cross-examination of witnesses on their recollection of the Board's June 9, 2020 vote, their understanding of the Sargeant investigation, and their interviews with Ms. Sargeant, among other lines of questioning.

We agree with the court's conclusion on relevance. The issue was whether Commissioner Coates had the authority on December 13, 2022 to vote on Mr. Belton's employment in light of the PRA or, put another way, whether the PRA precluded her from taking that vote. Resolving this issue required the court to admit facts establishing whether the Board enacted the PRA, when it did so, whether the PRA included a sunset provision, or whether the Board ever voted to modify or rescind it between June 9, 2020 and December 13, 2022. To be sure, the court would have had to decide the legal question of whether the Board had the authority to take this kind of action at all. But whether the Board *should have* adopted the PRA on June 9, 2020 based on the findings of the Sargeant investigation is a separate legal matter that the court didn't have to adjudicate to resolve the controversy before it, and it was not obligated to admit evidence of any facts bearing on that question.

As the circuit court noted, Commissioner Coates could have brought a civil action to challenge the PRA in 2020. At the evidentiary hearing, she testified that she had private counsel during Ms. Sargeant's investigation and on June 9, 2020, and that her attorney tried to obtain the Board's records so she could challenge the PRA. But she didn't challenge it, and that fact made an impression on the circuit court:

> [COUNSEL FOR COMMISSIONER COATES]: Your Honor, I don't think on the one hand, if I may, you could say that she took no action and really didn't seek to set [the PRA] aside. But on the other hand—
>
> [THE COURT]: I'm looking, when I say no action, I am looking at two things. One, any body public, either the Board of County Commissioners or in this court or some other court. That is what I mean when I say action.
>
> * * *
>
> [T]here is no, no action here. The point is . . . while there are discussions in the government, that is not an action.
>
> Action is a request, a bill, a request, an agenda item request, something along that line. Just talking to another commission member, I don't think is action, okay?
>
> [COUNSEL]: But one, she is not talking to just any commissioner, member, she is talking to the president. And two, she is asking about her appeal rights.
>
> * * *
>
> Well, can we at least proffer that she did ask for an appeal? That way we get a clean record?
>
> [THE COURT]: She didn't appeal
>
> * * *
>
> She didn't ask for an appeal. She didn't put it in writing. . . . She had a conversation with a colleague.

60

* * *

> [COUNSEL]: Can we at least get [President Collins's] answer on the record? I know the court say[s] it is not relevant about the appeal rights, and then we preserve the record?
>
> [THE COURT]: Sure, go ahead, Counsel.

If Commissioner Coates had brought that claim, a court might have considered whether the Board's decision was "arbitrary, capricious, or discriminatory." *Prince George's Cnty. v. Silverman*, 58 Md. App. 41, 50 (1984); *see id.* at 41, 48 (prospective purchaser of surplus property brought mandamus and declaratory judgment action against county after county council failed to pass resolution approving sale). But instead, she took no action, conducted county business under the PRA for more than two years, and then, after winning re-election, tried to fire Mr. Belton in the Board's first meeting of the new term. The advantage of keeping the PRA shielded from public scrutiny was not lost on the circuit court:

> [THE COURT]: Here is the thing. It was in her best interest that all of that be kept confidential.
>
> * * *
>
> All of these allegations were against your client
>
> * * *
>
> Some of them . . . pretty damaging . . . . So all that stays confidential from June of 2020 all the way up until, arguably, January of 2023, maybe late December of 2022. You get all that benefit, and now all of a sudden you say, "Oh, you didn't do it right, so we get all the benefits of the law."
>
> [COUNSEL FOR COMMISSIONER COATES]: But there is no benefit to her. She was reprimanded—

61

[THE COURT]: Oh, there was a huge benefit for your client, it was confidential.

[COUNSEL]: It, but what was confidential?

[THE COURT]: The PRA.

* * *

[Y]ou get a great benefit if some allegation is kept quiet before, two years before an election.

[COUNSEL]: Had this allegation come to light, Commissioner Coates could have put her side of the story—

[THE COURT]: Even if it is, now let's assume . . . that it is just an allegation, okay? It remain[s] silent pretty much until after the election in November 2022, correct?

[COUNSEL]: It does remain silent, but then it has [to] come out.

[THE COURT]: Well how did she not get a benefit from that?

[COUNSEL]: Because she could have put it to rest. There are lots of allegations made against politicians all the time.

[THE COURT]: She could have, but she never did. Part of, one of the things that I am wrestling with is in equity, you have to take action. You can't sit on your rights, okay, and then claim foul, okay?

* * *

[COUNSEL]: But, your Honor, she asked Mr. Adams if there was an appeal process, and she will testify about that, as well. You know, to say that she should have spent her own funds running to court to deal with this, I think that puts too much of a burden on her.

Even in 2022, Commissioner Coates didn't plead arbitrariness and capriciousness by the

Board in her counterclaim.[20]

Under these circumstances, we agree that the Sargeant investigation and the Board's action had become water under the bridge and were irrelevant to the question before the court. The forward-focused scope of the proceedings was consistent with the purpose of injunctions, *see El Bey*, 362 Md. at 353 ("[I]njunctive relief is 'a preventative and protective remedy, *aimed at future acts*, and is not intended to redress past wrongs.'" (*quoting Colandrea*, 361 Md. at 395)), and the court drew this boundary correctly.

Lastly, the circuit court's denial of Commissioner Coates's motion to compel was not incorrect legally or an abuse of discretion. Commissioner Coates moved to compel County Attorney Adams's deposition testimony after his counsel asserted the attorney-client privilege in response to most of her questions. She asserted that his counsel had misused the privilege and withheld nonprivileged information, including information already revealed in Ms. Sargeant's investigative report. She argued that the Commissioners waived the attorney-client privilege when they included the report and the language of the PRA as exhibits to their complaint and that the privilege no longer protected any questions

---

[20] Commissioner Coates cites *Hyson v. Montgomery County Council*, 242 Md. 55 (1966), and *Uhler v. Secretary of Health & Mental Hygiene*, 45 Md. App. 282 (1980), as support for her contention that the PRA was an arbitrary and capricious action. But neither case applies to a personnel action taken by a county board in its executive capacity. On June 9, 2020, the Board didn't adjudicate disputed issues of fact based on an evidentiary record in an adversarial hearing, *see Hyson*, 242 Md. at 64–65, and Commissioner Coates points to no legal authority entitling her to a hearing or administrative appeal to challenge the Board's action. *See Albert v. Pub. Serv. Comm'n*, 209 Md. 27, 36 (1956) (due process doesn't require a hearing unless a state agency acts in a judicial or quasi-judicial capacity).

about the Sargeant investigation and the Board's subsequent adoption of the PRA.[21]

The circuit court issued a memorandum and order of its decision, stating the pleadings and exhibits on which the court relied to reach its conclusions. The court seemed to agree that the county attorney's counsel had asserted the privilege too broadly. Ultimately, however, the court found that many of Commissioner Coates's questions reached matters subject to the privilege, such as confidential conversations with county staff, the engagement of Ms. Sargeant, and retention of outside counsel. *See Harrison v. State*, 276 Md. 122, 152 (1975) (when the subject matter of a question goes to a conversation between attorney and client, the privilege applies). The deposition transcript supports the court's finding.

For guidance on the question of waiver, the circuit court relied on *Haley v. State*, 398 Md. 106 (2007). *See id.* at 110–11 (information given by defendant to his attorney was

---

[21] Commissioner Coates's counsel crystallized her client's position on waiver at the deposition:

> [COUNSEL FOR THE BOARD]: [I]s it your position that the attorney-client privilege has been waived as to any and all matters during his entire tenure as the county attorney for Charles County?

> [COUNSEL FOR COMMISSIONER COATES]: No. My position is that anything that is at issue in this lawsuit, including the Sargeant investigation, which is really at the heart of this lawsuit, has been waived. So to the extent that there have been any complaints regarding Commissioner Coates, to the extent that Mr. Adams led the charge in initiating the investigation, all communications relating to the investigation, drafts of the report and subsequent communications, including all communications between Mr. Belton and Mr. Adams, I think, undoubtedly have been waived.

privileged "even though the information would later form the basis of his defense at trial"). The court noted the undisputed fact that the Board hadn't voted to waive the attorney-client privilege at any point in the case. Put simply, the court wasn't persuaded by Commissioner Coates's argument that a single commissioner, or even three individual commissioners, could waive the privilege for the county without a deliberation and vote by the full Board. Accordingly, the court disagreed that the Commissioners' submission of the Sargeant report and the PRA with their complaint waived the attorney-client privilege for the Board.

The court was right. The Board retained Ms. Sargeant and would have had to waive the privileged confidential communications among them. *See* Md. Rule 19-301.13(a)–(b) (an attorney employed by an organization represents the entity acting through its constituents, and if a constituent's action is likely to substantially injure the organization, the attorney must act in the best interest of the organization); *City of Coll. Park v. Cotter*, 309 Md. 573, 591 (1987) ("[T]he authority to waive the privilege belongs to the client alone."); *Caffrey v. Dep't of Liquor Control for Montgomery Cnty.*, 370 Md. 272, 303–04 (2002) (county is entitled to assert or waive the attorney-client privilege in Maryland Public Information Act dispute); *Geier*, 225 Md. App. at 152–54 (privilege extends to communications between Board attorneys and Board investigator). Moreover, when a privileged communication has been waived, it begins and ends at the specific communication or information item disclosed. *See Casey v. State*, 124 Md. App. 331, 345–46 (1999) (waiver is limited to the specific confidential conversation that client disclosed to third party); *Harrison*, 276 Md. at 150–51 (general statement isn't enough to waive privilege; client must have revealed the words or subject of his confidential conversation).

65

Ultimately, the court didn't find that the county attorney's deposition was necessary or appropriate based on its review of the exhibits presented and the deposition testimony that had been provided by Commissioner Coates and President Collins. Because Commissioner Coates had other evidentiary sources from which she could draw facts relevant to her defense, and because the primary aim of her deposition and motion to compel was to elicit information about the Sargeant investigation and the Board's reasons for imposing the PRA—testimony that would have been privileged and touched on issues that were irrelevant—we conclude that the court's ruling was well-reasoned, logical, and a sound exercise of discretion. *See Bord*, 220 Md. App. at 566.

We hold that the court's quashing of Commissioner Coates's subpoenas and evidentiary rulings were reasonable because they kept the case focused on the existing controversy between the parties. And the court did not abuse its discretion when it denied Commissioner Coates's motion to compel additional testimony from the county attorney.

> **JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLANT TO PAY COSTS.**